Thank you. That concludes the argument in Ms. Foster's case. So I'll now call the case of the United States v. Willis Maxi and Mr. Blank and others. David Marcus Good morning, Your Honor. My name is David Marcus. I represent Marquandt-Blank. Before the court is the issue of whether or not the wiretap application that was submitted to the district court was adequate. My argument is that the application had material misrepresentations in it that caused the issuing judge to believe that a wiretap application was the only way – was necessary and was the only way for the government to proceed in its investigation. The primary deficiency in the affidavit is that the affidavit described their confidential source as a member of the DTO, Drug Trafficking Organization, who has a limited knowledge of the operational activities of the DTO. That statement was inaccurate. It was false. In fact, the agent at the hearing admitted that the confidential source was a lieutenant in the Drug Trafficking Organization and that he actually was the lessee of one of the stash houses of the organization. At the hearing on the motion to exclude the wiretap, the agent had no explanation for why he described the confidential source in the manner that he did, and he had no explanation for why he didn't inform the court that, in fact, the person was a lieutenant and the lessee of the stash house. How would that have made a difference if he had done that? Because I think the agent would have been able to further investigate with this confidential source, and it conveyed to the judge that this confidential source was less involved in this drug trafficking organization than he really was, which made the necessity for – But you're complaining about the first wiretap application because he was dead by the time the second application was made, correct? Yes, but the first wiretap application, my client is picked up on that wire. He's in a grief party, and the probable cause that was generated from the first wiretap is used in the second wiretap application, which is the wiretap application on my client. And there was probable cause independently in the first application, correct? I mean, there was all the activity at the time of the surge and going into the stash house that Maxie was in. Yes, sir. There was probable cause, but that doesn't mean that it was necessary for a wiretap to be had. There were other investigative techniques that could have been done, including – What were those? They could have placed a tracker on my client's vehicle, and I believe that the explanation given for why they didn't put the tracker on is inadequate. They could have followed Pitt, who later became known as Defendant Voltaire, who was supplying the retail stash houses with cocaine. I believe that the explanation for why they didn't follow Pitt and try to further that lead was inadequate. I think when you put all of those things together – Should we be second-guessing these law enforcement decisions to that degree to determine whether or not, in their judgment, they were – when they make a judgment about whether it's risky to follow a particular defendant or maybe it may uncover the entire investigation if they put on a tracking device, should we be in the position of second-guessing those decisions? I think you absolutely should be, because the court needs to make a finding as to whether a wiretap was necessary. If the police are just allowed to make conclusory statements without review by the court, then the necessity requirement of the statute becomes meaningless.  Thank you, Your Honor. Good morning, Your Honors. My name is Roy Kahn. I represent Willis Maxey. He's the appellant here and was one of the defendants below. Different than Mr. Marcus's client, my client's participation in this alleged conspiracy occurred on one day. The allegations were that he was an individual in charge of a particular stash house. This actually initiated all the investigation and the wiretaps that followed against alleged co-conspirators. This case began on July 9, 2012, when a Detective Ogden learned from an informant that this particular house may be a drug house containing drugs and weapons. The informant, according to Mr. Ogden's testimony, was uncorroborated, never tested. The information and the source of that information was never substantiated. It was just an individual saying, there's a drug house on this location. The police started doing the right thing. They set up surveillance. Multiple cars set up surveillance on the premises. Within 30 minutes of that surveillance, two black men were observed leaving the house, getting into a black pickup truck and departing the premises. Without any probable cause or any founded suspicion or any type of activity that can be deemed suspicious, the vehicle was stopped and identifications obtained. Search for contraband was negative. No criminal activity. The two gentlemen were allowed to leave by these police officers. Unfortunately, the two gentlemen returned back to the premises that were under surveillance, at which time the police misconduct begins. The individual vehicle pulls up into the driveway. An order is given to raid and detain. Ten officers, five police cars approach the premises. The two individuals, not having done anything wrong or having any founded suspicion of illegal activity, were arrested, taken to the ground. Five of those officers approximately go through the curtilage of this premises. It's a linked gate fence around the home. Enter through the gate. Approach the front door of this premises. At least one of the officers, according to the testimony both at the motion to suppress and at the trial, had his gun drawn. Other officers surround the house. Knocked on the door. Mr. Maxey is in the house. He opens the door. Question is, at this point, have the police violated any constitutional right of Mr. Maxey, who was the resident of that house? The answer is yes. The government has relied upon. You're saying that there was a show of force at that point. Correct. The government relies on the knock and talk exception. Can you answer the government's argument that the blinds were drawn and, therefore, whatever the show was, was not seen by its audience? Government argues a subjective knowledge requirement on the part of the tenant of the house. That's incorrect. According to Jardines and Walker, which is this court's decision following the same analysis as Jardines, it's an objective standard. It's an objective standard whether the police act in accordance with the custom. Wouldn't the objective standard be whether a reasonable person in Maxey's position would have understood that there was a show of force? No. I believe that the standard for evaluating the police. I'm sorry, Judge. No. I mean, if people surround a building and nobody knows about it who's inside, why would that, and no reasonable person inside could be held to have knowledge of it, why is that an effective show of force? The show of force has its force because it's perceived, not because it just occurs in the abstract. In Jardines, the tenant or the people in the premises where the drug-sniffing dog was brought upon the property, whether that person knew there was a violation of the Fourth Amendment or not is irrelevant. This is a violation of the curtilage of the home, and the case is all set. If I could interrupt you for a moment, Mr. Kahn, and then you can return to Judge Walker's question. Your curtilage argument, as I take it, is not dependent on any show of force. Correct. I agree. Right? Correct. That's where I think Judge Walker is trying to get at, that if you're relying not just on the intrusion into the curtilage, that that, at least I speak for myself, that may not require any subjective knowledge on the part of the occupant of the home or the owner of the home. But if you're looking at the use of force and whether a reasonable person would feel free to leave or feel that he had to do what the police asked him to do, then it might become relevant. Correct. My argument is not that he complied voluntarily when he opened the door on the knock. The argument is the first stage. When the police enter a home's curtilage, it is a trespass and a violation unless it falls within a certain exception. The exception relied upon by the government that this was a knock and talk. Jardines lays out the narrow exception for knock and talks. That is that the police are given the same license or granted the same rights as the general public. That is customary in this country. So the UPS person, the meter reader, all have a right to approach a front door and speak to the occupant. How about a salesperson? Even a salesperson. Any type of person that our country recognizes that license to approach a front door and talk is the same right given to police, provided that they do it in the same custom and manner that's open to the public. In this case, that's not what occurred. I don't want to make you argue against yourself, but how could they have done it appropriately in this case, if at all? Well, number one, my first discussion of certain facts were establishing police misconduct. That being arresting people with no probable cause and no evidence of criminal conduct. Had they, during the surveillance, without approaching this vehicle and arresting the two black men who did nothing, had they merely approached the front door when they were conducting the surveillance at a given time to knock on the door and see what's going on, that would have been fine. There would have been no issue. But instead, what they did is illegally detain and arrest people who did nothing wrong, show a full force, and it wasn't the requirements of Jardines were not met. But those things you just mentioned are irrelevant to the curtilage issue, are they not? Correct. But it shows that they violated their dictates of Jardines. Correct. It goes to the second issue and the third issue on the Fourth Amendment violation, that being the breaking open of the door when Mr. Maxey is standing there responding to the knock. And they break open the door to arrest him when he had not given them the key to allow entrance into the premises. And the third issue being when the door was broken open and Mr. Maxey was removed across the threshold taken outside, the police on their own decided that they would search the house. They claim it was a protective sweep, but there was not a single articulable fact presented at any time, either in the motion to suppress or at the trial, that established that there was a reasonable suspicion of other individuals being at the house. In fact, Mr. Maxey spoke to the police there for minutes, was standing there present when they broke open the door, and there was no indication of movement or any other evidence that there were people in the house. So their entry into the house, even if Jardines' requirement was met, even if they knocked on the door and saw her into the dark room, cocaine sitting in a bowl in the living room, and that probable cause to arrest existed without considering Wong Sung and Fruit of the Poisonous Tree. Even if the arrest was legal when they broke open the door and took them out of the premises, they had no right to then conduct a search in the house without getting a warrant under Peyton. That was an illegal search. There was no exigency, nothing established in the record. Thank you. Thank you. Good morning. Good morning. Good morning, mate. Please, the court, Tanya Long for the United States, would ask this court to affirm the district court in this case. I'd like to start with Mr. Maxey, and I'd like to start with an issue that is the primary issue in any Fourth Amendment context, which is the issue of standing. And in this case, the court can affirm for any basis supported by the record, and the government asks here that you affirm the denial of Mr. Maxey's motion to suppress based on the fact that he failed to establish that he had a reasonable expectation of privacy in this property in the district court. He lived there at least part of the time, didn't he? The facts do not bear that out, Your Honor. What Mr. Maxey testified— He spent the night there, several nights. That he had been there at night the past three or four days on and off, but he also testified that when he was there, he was never asleep, that he was there just to pay the bills, that he had no— He paid rent there, right? He paid half the rent? He did testify that he paid half the rent, but— And I think also that he had been kicked out of his father's house, so he didn't really have anywhere else to live, did he? I mean, there's no evidence that he had anywhere else to live. Your Honor, he testified at the hearing that he really lived at his father's house, that he kept all of his clothes, everything was at his father's house. But he had been kicked out of his father's house. Wasn't that part of his testimony? I don't believe that was part of his testimony at the suppression hearing. That may have been part of the story that he told the police when he gave an interview with him the night that he was arrested, but I would have to double-check on that, Your Honor. But what he did testify at the hearing is that he did not know the leaseholder that well, that he only had access to the living room, the kitchen, and the bathroom. He had no access to the bedroom, that the only property of his that was present there in the residence was his wallet and ID, that he really lived at his father's house. That's where he kept his clothes and everything, that he was at the stash house for a few days, but not every day, just to pay the bills only. And then when he was there, he, quote, never be sleep. So the evidence here establishes that Mr. Maxey was just the night watchman who was the cut man at this property, which is used just for commercial purposes to package these drugs. But if he used it all the time for that purpose and was there all the time, the commercial nature of the activity wouldn't impact his expectation of privacy, right? Well, Your Honor, in the case of United States v. Cooper, which we cited in, I was quoted in United States v. Rivera-Pabon, it says that there's a lower expectation of privacy in a house used mainly for commercial purposes, and that to have a reasonable expectation of privacy, you must establish that you're a guest for personal reasons. He was not a resident here. There's no evidence that he actually lived here. In the district court, the magistrate judge did find that he was an overnight guest. But the facts here, the evidence here does not bear out that he was a personal overnight guest. Do you think the magistrate judge clearly erred in so finding? Yes, Your Honor. And I think that the magistrate judge really kind of passed over this issue. During the hearing, there was a statement that, in an abundance of caution, there was standing here. And then there's just kind of a footnote dropped in the report and recommendation that they're standing and citing a case for the overnight guest. So I think the magistrate judge here really wanted to get to the merits of the issue and didn't give kind of full fright to this issue, and so did err. And we would ask that the court affirm on that basis. If there are no further questions. Assume we don't. Yes, Your Honor. As I understand the government's position, you think that this was a knock and talk by these officers? Yes, Your Honor. And I think that the most important issue to focus on here is the real question is when Detective Ogden approaches the door and knocks, is he lawfully in place? Because at that point, when Mr. Maxey opens the door. But he's accompanied by four other officers, right? The testimony was yes. Between four or five officers actually approached the door in this case. And at least one of them we think had a gun drawn, right? One officer did testify. That was Officer Cardeso. He testified that he had his gun drawn in a low ready position. But he also testified that he only came up to the door after the door was already open. And that was at docket entry 248, page 101. Was that gun visible to Maxey? He testified that it was in a low ready position, and the magistrate judge found that it would not have been viewable by Mr. Maxey. Certainly, at the time Mr. Maxey opened the door, it would not have been viewable because we've introduced the government's exhibits in this case showing that the windows were blocked. There's absolutely no indication that Mr. Maxey knew anything that was going on outside the house at the time he opened the door. And it seems that counsel has conceded they're not arguing that it was an involuntary opening of the door, that Mr. Maxey's will was overborne, that he felt he had to open the door. I should probably ask your adversary this, but is there any case in the 11th Circuit that limits the number of people who can be present at a knock and talk? A number of police who can go up to a knock and talk that says if it's two, that's fine, but if it's more than that, it's not fine. No, Your Honor, not that I was able to find in my research. And such a bright line rule would kind of go in contrary to the reasonableness analysis that we have under the Fourth Amendment. And I would point to a case like Kentucky v. King, which was the Supreme Court case that found that you could have a police graded exigency. And in that case, we had multiple law enforcement officers who ran towards the door. They knocked forcefully. They did identify themselves. And that was found to be a permissible knock and talk. At the time they entered, didn't Blank try and run before that? There were two times that he tried to run in this case, right? Yes, Your Honor. When he was ultimately arrested, but then earlier on this occasion, I think he tried to run. Yes, so he was initially stopped in the car and then released. And then he returned, along with Codefendant Pierre, who's not part of this appeal, to the residence. The officers also arrived. And when he saw the officers, he took off running. So the officers had the informant's information. Yes. And then they also had the fact that Blank had tried to run away, having been surveilled coming out of the house, which arguably, I suppose, could reinforce their belief that there were guns and drugs in the house. And that if there are guns in the house and the police are coming, then that raises the question of whether what they did could be considered appropriate, given the fact that there might be some danger there. Well, Your Honor, they took some tactical positions around the house because of the danger. They sent multiple officers to the door, but none of that really – and that was reasonable for them to do, given the knowledge that there may be weapons inside the house. Exigent circumstances? Is that your argument? Well, not exactly, Your Honor, because I'm not arguing here that they had reasonable suspicion to enter the house. This is a knock and talk. This is them going up to the door and knocking and Mr. Maxey opening it voluntarily. But I think under the circumstances here, it was reasonable for them to have some coverage in case something turned bad at the door when they opened the door. It's very possible here that Mr. Maxey opened the door. He has the assault rifle. He starts shooting. And it's reasonable in that situation to have other officers kind of in other positions where they can cover the officer at the door if that happens. That didn't happen here. When the officers went through the first gate into the yard, what did they do? Who went to the door and did others go elsewhere? Well, Detective Ogden, who is the person who primarily testified as seeing the drugs in this case, he testified that he walked directly to the door, that he was with three or four officers who were behind him. Other officers testified that they came up at different times to the door. There were two other officers who testified that they were on surveillance at other points around the house. Now, they didn't testify as to whether they were within the curtilage or without. That just didn't really seem to be an issue here. Do we know whether the gate was open? They went over a fence, but I don't know. Was the gate open when they got there? Do we know? Is there any evidence about that? Your Honor, there is not any evidence I was able to find in the record of whether it was open. It certainly was not locked. But I don't think any of the officers remembered whether they had to open the gate or if they simply walked through an open gate. But here what we have is another question where we have to look at Mr. Max's point of view for his reasonable expectation of privacy and if that was actually encroached in a way that led to the discovery of evidence. Now, there were other people who were detained on the property, Mr. Blank, who ran and was detained, and Mr. Pierre. But the detention of them did not in any way affect whether Detective Ogden was lawfully in place when he goes up to the door to knock. He's going up. He's doing a knock and talk. He does not demand that Mr. Maxie come out of the door. He does not in any way force his way in before seeing the drugs in plain view. And Mr. Maxie's will is not overborne in opening the door. So the question is the other officer's presence on the property, does that in some way invalidate this entire encounter from the beginning? The government argues that it does not. I mean, for me, I understand your argument. But from my point of view, you're collapsing two different things. I think it's one thing about how the police approached the house. I thought the whole idea from Jardine's, if I'm pronouncing that correctly, was police have the same right to approach a house as any other citizen. You walk up. You knock on the door. Let's see, what did he say? Approach the home by the front path, not promptly, wait briefly to be received, and then absent an invitation to linger longer, leave. So that's one thing about whether this was a knock and talk. But whether Mr. Maxie's will was overcome by a show of force is another in my mind. Do you separate those two things? I think we can separate those two things, yes. And to talk about the first thing, Jardine's is a case about whether this was a search. There was a dog being brought up. They did a dog sniff. They found drugs, dog alerted. They never even went to the door, just went back and got a warrant and then served the warrant. So what Jardine's is saying is you can't pretend that just because you can go up to the front door and knock on it that it's not a search. When you bring a dog in, specifically search that area. It was not limited to a dog. Justice Scalia also said you can't dig through the bushes, you can't do all of those things, just because you could walk up the front door. But the key difference here is that the officers are not searching. They're on the property, but they're not searching. It would be one thing if they're digging through the bushes when they're taking tactical positions and they're finding evidence. Another thing is when they detained Mr. Block, they can see through a window and they can see other evidence that then leads them to go up to the door and knock or provides additional evidence for the search warrant. None of that happened here. The other officer's presence on the property actually led to the discovery of any evidence. And so because it didn't lead to the discovery of evidence and it didn't impact the decision to go up and knock on the door, it really is irrelevant in this case for whether there was some kind of infraction that led to the discovery of evidence. The exclusionary rule only applies to conduct that results in the discovery of evidence here. And there was no difference for Mr. Maxey's purposes if Detective Ogden had been alone and walked up to the door and knocked. Still, Mr. Maxey has opened the door voluntarily. He's exposed the drugs behind him to plain view. And at that point, there's probable cause. And everything after that point is excused by the independent source doctrine. There's no further questions. Do you want to address the wiretap? Yes. Yes, Your Honor. I was just moving to that now. So the district court found appropriately that there were no material false statements or omissions here in the wiretap affidavit. The omission of the word lieutenant is not material in any way because the affidavit very carefully set forth what the primary CS did know. That he was a former member of the organization. That he had limited knowledge. But then it also goes through and talks about some of the knowledge that he did have and the things that he didn't have. That the CS was not able to go back and re-infiltrate the organization because it was a close-knit group. Because they were suspicious of outsiders. Also going into the necessity components. There's lots of reasons set forth in this affidavit about why these other techniques, additional surveillance, would not lead to the discovery of the evidence that they needed and would not be viable. And that's because there were counter surveillance techniques. That's because this is a very, again, small, tight-knit community. There are lookouts. There are people keeping watch. And I think that the affidavit did a good, specific job of laying out all of these risks and all of the reasons they would not be able to get the evidence this way. This was not just a blanket pro forma affidavit. It's very specific about what they did, what they considered trying, and why that would not work. So for those reasons, we ask this court to affirm. Thank you. Thank you. Very briefly in rebuttal, I'd like to return to the question that Judge Walker asked of should you be second-guessing the police officers. And I would ask the question, if not you, then who? Because that necessity requirement in the law. There obviously has to be some review, clearly. But courts review in areas where there is some latitude and discretion. I mean, we defer to agencies. We defer to various other bodies that have real expertise and have to make judgments about things. Now, obviously, if these affidavits were fabricated in the sense that there were no prior efforts to search or to engage in law enforcement techniques, or if the warrant was sought as a first order of business rather than later on, that would be courts would step in. But my question is, with the details of what technique to use, and when they say they're going to be at risk in a certain way, how do we know that they wouldn't be? I think you have to consider what they say. But I don't think that just because they say it that the court should automatically accept it. And I think that in this case, when they describe their primary informant and leave out the fact that he's a lieutenant in the organization and is a lessee of one of the stash houses, I think that's a glaring misrepresentation of the court. You're saying that in the present tense or in the past tense? In the present tense. So he was still, in your view, a member of the organization? No, no. I misunderstood the court's question. He was a past member, and he was the lessee of one of the stash houses of one of the organizations. So he had far more knowledge as a lieutenant and as a lessee than as somebody who is described in the affidavit as a former member with limited knowledge. I completely understand the argument, but your contention is not that at the time the affidavit was submitted, he was still a lieutenant and still leasing one of those stash houses. No, it is not. He was a former. He had that knowledge and that status at the time described. Correct. And my contention is he had a lot more knowledge about the operation of the drug organization than was described in the affidavit. Thank you. In the brief time I have, I'd like to address first Judge Walker's concern about the subjective knowledge of the occupant of the house as to what the police were doing outside. That is not the standard set up in Jardines. You made that point. Oh, I'm sorry. My question is it couldn't be subjective in the sense that if he saw a bunch of people, he thought that they weren't – if he saw people, a lot of people, that he couldn't – the government then would not be in a position to say, well, there's no evidence that he really paid any attention. That would be subjective. The question is under what occurred here, what would a reasonable person have concluded? That's not the standard set out in Jardines. I want to quote to the court at page 1417. Here, however, the question before the court is precisely whether the officer's conduct was an objectively reasonable search. Here, their behavior objectively reveals – You're confusing – now you're confusing the search aspect with the show of force aspect. A show of force has to be perceived to be a show of force. Otherwise, it makes no sense. The show of force discussion, Your Honor, is only to show they didn't comply with what a reasonable person would do in approaching a house for any purpose or given the license that they have to approach a house. Oh, I see. So you're not arguing that – I'm not arguing the show of force where the opening of the door was based on – that show of force shows that it's far afield of what Judge Scalia was talking about when we give the license to police to come up to someone's property through the curtilage and knock on a door to talk. Just like the meter reader, just like the – Your adversary's talking about the difference between whether it was a search from the get-go or not. She's arguing that it wasn't a search from the get-go, but Jardine's was because they brought a dog in. So is this. It's not an issue of why and what you were doing there as far as gathering evidence or complying with the requirements of Jardine's. For example, in my home, if – to come there with ten people with guns drawn, approach your house, grab two of your guests that are on your property, throw them to the floor, that's not in the license to approach a house, nor is it a license given to the police. Those are very strong sales tactics. Well, it's extremely strong. But it's not the license that Jardine's is granting the police that is the same license given to the community at large. So from that point on, everything that happened was inappropriate and illegal. Nothing else. I'll sit down. Thank you. Thank you. Thank you.